IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 08-41-JJF |
| | ) | |
| JAMES COOK, | ) | |
| | ) | |
| Defendant. | ) | |

### GOVERNMENT'S MEMORANDUM IN RESPONSE TO THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

On March 4, 2008, defendant James Cook was indicted with one count of attempting to possess with intent to distribute a mixture and substance containing a detectible amount of cocaine, in violation of Title 21 United States Code, Sections 841(a)(1), (b)(1)(C), and 846, and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). The events surrounding these charges took place in late December 2007 and early January 2008, at which time members of the Drug Enforcement Administration used a confidential source to arrange a sale of ten ounces of cocaine to the defendant, and the defendant was later found to have eleven (11) firearms at his residence.

On May 1, 2008, the defendant filed a Motion to Suppress Evidence (D.I. 18), wherein he asserts that law enforcement agents arrested him without probable cause, illegally searched his person, vehicle, and home, and obtained a statement from him without informing him of his rights under Miranda v. Arizona. The Court held an evidentiary hearing on the defendant's motion on June 4, 2008.

The government respectfully asserts that these arguments lack merit. First, as the record

reflects, on January 3, 2008, the totality of the circumstances would lead a reasonable officer to believe that the defendant was attempting to take possession of ten ounces of cocaine. Accordingly, there was probable cause for his arrest at the time. Second, the defendant's person and vehicle were searched pursuant to that arrest; this practice is clearly allowed under Third Circuit and Supreme Court precedent. Third, law enforcement agents only searched his home after he read and signed a form giving them express consent to do so. Fourth, the defendant only gave a statement to law enforcement after being explicitly advised of his Miranda rights and enacting an express waiver of those rights. Accordingly, the government respectfully asserts that the defendant's motion should be denied in its entirety.

## PROPOSED FINDINGS OF FACT

David Hughes is a special agent with the Drug Enforcement Administration (DEA), and has served in that capacity for nine years. Transcript of June 4, 2008 Evidentiary Hearing (D.I. 23) at 4. In connection with his employment at the DEA, as well as his prior career as a Maryland State Trooper, Agent Hughes had received various forms of training with regard to narcotics distribution, transportation and concealment. Id. Further, he has personally made several hundred arrests for narcotics trafficking offenses. Id. at 5.

In the latter part of December 2007, a confidential source (CS) informed Agent Hughes that he, Cook and another individual had recently been in discussions with regard to transporting kilograms of cocaine from California into Delaware. Id. at 7-8. Further, the CS indicated that he and the defendant had a history together involving cocaine distribution, and that the CS had sold cocaine to the defendant in the past. Id. at 7. Agent Hughes regarded the CS as reliable and trustworthy, due to the fact that the CS had provided him with information in the past that lead to

arrests and seizures. Id. at 7.

After receiving this information, Agent Hughes determined to perform a "reverse operation" on the defendant – that is, an investigation technique where a DEA agent, or someone acting on his behalf, poses as a drug dealer in order arrest someone who is looking to purchase controlled substances. Id. at 9-10. In the course of this particular operation, Agent Hughes had the CS perform a series of four recorded and monitored[1] calls to 302-893-9333; copies of the digital recordings of these calls are contained in Government's Exhibit 2 (GX 2).

### A.    Call 1 – December 27, 2007

The first recorded call occurred on December 27, 2007, at approximately 1:00 p.m. D.I. 23 at 14-15. In this call, the CS set up a transaction to sell ten ounces of cocaine to the defendant in order to obtain money for an attorney – an arrangement that the CS indicated that he and the defendant had made before:[2]

CI:[3]    Hey look baby, look, man, I gotta [unintelligible] I just got back from my fuckin' lawyer's office….and uh….I got to at least have 10 stacks[4] down for him.

Cook:    What is it?

---

[1] Agent Hughes would either (1) have the CS perform a "three way" call so that Hughes could monitor and record the conversation, or (2) Hughes would be physically with the CS when he made the call. Id. at 13-14

[2] See D.I. 23 at 56 (indicating that, in the past, the defendant had loaned the CS money for an attorney in exchange for the delivery of cocaine). If a confidential source is used in a reverse operation, Agent Hughes typically advises him not to deviate from his normal pattern of interacting with the target; otherwise, it would raise a red flag that law enforcement was involved. Id. at 10.

[3] In the transcripts, "CI" or "confidential informant," refers to the CS.

[4] "Ten stacks" refers to ten thousand dollars. D.I. 23 at 17.

> CI: I gotta at least have at least 10 stacks down for my lawyer.
>
> Cook: Right.
>
> CI: And, uh, do remember that thing[5] we talked about the other night?
>
> Cook: Yes.
>
> CI: I need to get rid of that bad man, I gotta bring [UNINTELLIGIBLE]…
>
> Cook: Let's go.
>
> CI: …[UNINTELLIGIBLE]… kind of money.
>
> Cook: Let's go.

GX 2, Track 1 at 00:16-00:35; Transcripts of Recorded Calls, Government's Exhibit 1 (GX 1) at Track 1; D.I. 23 at 56 (testimony of Agent Hughes that the CS had informed him that he and the defendant had made similar exchanges in the past); D.I. 23 at 17, 45, 49 (Hughes' opinion that the conversation was setting up a drug deal).

Although the defendant – by saying "let's go, let's go" – appeared ready to conduct the transaction at the time of the phone call, Agent Hughes was not. D.I. 23 at 18. Accordingly, the CS, at Agent Hughes' direction, responded that he had to get the ten ounces of cocaine from his brother, who was not yet off of work:

> CI: I got to get it from my brother first, when he gets off work.
>
> Cook: Huh?

---

[5] Agent Hughes testified that the CS informed him that "that thing" that he and Cook were talking about was ten ounces of cocaine. D.I. 23 at 17. Indeed, in Hughes' experience, the phrase "that thing" is often used in connection with drug transactions. Id. at 47. Explicitly referring to cocaine or other controlled substances over the phone is not a customary practice in the drug trade. Id. at 56-57 (Hughes indicating that in his 15 years of law enforcement experience he has never heard anyone ask to buy "cocaine" from someone).

> CI:   I got to get it from my brother when he gets off work.
>
> Cook: Oh you gotta wait?
>
> CI;   Well, until he gets of work.
>
> Cook: When's that?
>
> CI:   He gets off at 8 o'clock tonight, he works at, he's working at Charlie's Pizza, 273.
>
> Cook: Oh, ok.

GX 2, Track 1 at 00:41-00:53; GX 1 at Track 1; D.I. 23 at 19. Nevertheless, the defendant made repeated efforts to meet with the CS that day. D.I. 23 at 19. Agent Hughes interpreted this behavior as an attempt by the defendant to discuss the details of the transaction in person, as opposed to over the telephone.[6] Id. at 19.

**B.    Call 2 – January 2, 2008, 3:05 p.m.**

The CS made a second recorded call to the defendant on January 2, 2008, at 3:05 p.m. Id. at 21-22. In that call, the CS again referenced needing money for his attorney, and asked whether the defendant was still going to do "that thing" with him – referring to the ten ounce cocaine deal.[7] Id. at 17, 22; GX 2, Track 3 at 00:22-00:25; GX 1 at Track 3. The defendant did not directly respond to the CS's inquiry, but repeatedly asked the CS to come and see him in person. D.I. 23 at 22-23. As before, Agent Hughes interpreted this behavior as an attempt to meet with the CS in

---

[6] As Agent Hughes explained, there are two distinct advantages to discussing a drug deal in person, as opposed to over the phone. Id. at 19. First, if the meeting is in person, there is no danger of the call being intercepted. Id. Second, if you meet face-to-face, you have the opportunity to observe someone's demeanor and body language. Id. at 19-20.

[7] Hughes and the CS, at this point, were of the opinion that the transaction was still a "done deal." D.I. 23 at 51. Nevertheless, Hughes had the CS ask this question in order to help establish a record of the transaction. Id. at 57.

person in order to avoid detection from law enforcement.  Id. at 23, 57.  The CS did not, however, meet with defendant at that particular time, because DEA was not ready to perform surveillance on the meeting.  Id. at 23.

### C.    Call 3 – January 2, 2008, 7:05 p.m

Later that day, at approximately 7:05 p.m., the CS made a third recorded call to the defendant.  Id. at 23.  Due to staffing reasons, Agent Hughes had decided to coordinate the transaction between the CS and the defendant the following day.  Id. at 24.  Accordingly, he instructed the CS to tell the defendant that he couldn't get "it" – the ten ounces of cocaine[8] – from his brother until the following morning.  Id. at 24-25.  To Agent Hughes, who was listening in on the call, the defendant sounded disappointed:

> CI:    Hey look, uh, I'm gonna hook up with my brother first thing in the morning, right?
>
> Cook:  Ahhh man…all right, can, can't catch anything tonight?
>
> CI:    Nah, I can't get nothing, 'cause he's uh, he's working and he has to go back to the Plummer Center, but he's gonna come by here first thing in the morning, and my girl . . .
>
> Cook:  Okay.

GX 2, Track 5 at 00:09-00:23; GX 1 at Track 5; D.I. 23 at 24-25.  The CS and the defendant then resolved to talk the following day.  GX 2, Track 5 at 00:24-00:38; GX 1 at Track 5; D.I. 23 at 25.

### D.    Call 4 – January 3, 2008, 10:37 a.m.

Agent Hughes and DEA Task Force Officer Michael Van Campen met with the CS around 10:15 a.m. on January 3, 2008.  D.I. 23 at 26.  In Agent Hughes' presence, the CS made a fourth

---

[8] Id. at 24-25

recorded call to the defendant. Id. The defendant indicated that he was going to pick up a cup of coffee at "the spot" – a location that Agent Hughes knew, from speaking with the CS, to be an Exxon located around Route 4 and Route 7. GX 2, Track 7 at 00:30-00:39; GX 1 at Track 7; D.I. 23 at 27. The defendant then instructed the CS to "run across the street and come see [him]." GX 2, Track 7 at 00:34-00:40; GX 1 at Track 7.

### E.  The Arrest of the Defendant

After the fourth recorded call as made, the CS was given ziplock bags full of "sham"[9] – a substance made to look like ten ounces of cocaine – that were placed in an untied plastic shopping bag. Id. at 27-28. Agent Hughes and several other agents set up surveillance at the Exxon. Id. at 27. Approximately eight minutes later, Agent Hughes observed the defendant enter the Exxon parking lot in a dually pick up truck.[10] Id. at 30.

The defendant first pulled around to the front of the mini-mart area of the Exxon and let two white males out of his truck. Id. at 31. The defendant then pulled his truck beyond the mini-mart entrance to a location that was more of the way. Id. From Agent Hughes' vantage point, approximately twenty-five (25) feet away from the defendant, he was able to see the CS cross the street and enter the defendant's truck carrying only the plastic bag with the sham. Id. at 32-34.

The CS entered the truck and turned toward the defendant. Id. at 32-33. While the CS was in the defendant's truck (approximately 30 to 60 seconds), Agent Hughes observed the defendant

---

[9] "Sham" is used in reverse operations instead of real cocaine so that, if something goes wrong, DEA has caused drugs to get on the street. Id. at 28.

[10] Agent Hughes knew, from information obtained through the CS, that the defendant would likely be driving a gray Dodge Ram dually pickup truck. D.I. 23 at 30. Further, Agent Hughes had seen the defendant's picture prior to this occasion. Id.

turn to face the CS, and the CS make a hand movement towards the defendant – as if he were handing something over.[11]  Id. at 33.  The CS then removed his baseball cap – a signal that he and Agent Hughes fashioned to indicate that the sham cocaine had been delivered.  Id. at 34.

Agent Hughes, along with other agents and officers, then moved in to arrest the defendant. Id.  The defendant was removed from his vehicle, placed on the ground, and then handcuffed.  Id. at 35.  He was then searched incident to arrest and found to have $4643.00 on his person, as well as a vial of prescription pills.  Id.

### F.     The Defendant's Post-Arrest Statement and the Search of His Residence

Immediately after his arrest, Agent Hughes read the defendant his Miranda rights from his DEA 13A card.  Id. at 35-36; Government's Exhibit 5 (GX 5).  Agent Hughes, however, waited until the defendant was transported back to the DEA office to interview the defendant.  Id. at 37.

Once at the DEA office, the defendant was placed in an interview room with the door open. Id. at 37.  The defendant was not in handcuffs.  Id.  At that time, Agent Hughes went over the defendant's Miranda rights with him again, using a DEA Form 13; the defendant signed the form, waiving those rights.  Id. at 38; Government's Exhibit 3 (GX 3).  The defendant then proceeded to give a 45-minute statement with regard to a number of topics, including his involvement with cocaine trafficking and purchasing.  Id. at 40.

During his statement, the defendant indicated that he had certain contraband at his home, including a firearm and certain prescription tablets; with this in mind, Agent Hughes asked for the defendant's consent to search his residence.  Id. at 40-42.  In particular, Agent Hughes went over a

---

[11] Agent Hughes was not directly able to see the actual bag being transferred, as the defendant's truck was too high off of the ground.  Id. at 33.  However, at the time he stepped into the defendant's truck, the only item in the CS's hands was the plastic bag full of sham.  Id. at 34.

DEA Form 88 with the defendant, giving consent to search the residence – 2325 Diamond Street in Wilmington – which the defendant signed. Id. at 42; Government's Exhibit 4 (GX 4).[12]

The defendant was transported to the residence along with Agent Hughes, and Task Force Officers Grajewski and Collins. Id. at 42-43. The house was unoccupied and the defendant, without handcuffs on, led the agents/officers around his house, pointing out where various contraband was located. Id. at 43. At the residence, law enforcement officers located 11 firearms, various types of prescription pills, as well as a knife and a digital scale – both of which were covered in what appeared to be cocaine residue. Id. at 43-44.

## PROPOSED CONCLUSIONS OF LAW

In his Motion to Suppress (D.I. 18), the defendant makes four arguments as to why various evidence recovered in this case should be suppressed: (A) his arrest was not supported by probable cause (Id. ¶ 13); (B) the search of his person and vehicle after his arrest was not supported by probable cause (Id. ¶¶ 14-15); (C) the search of his home was unconstitutional (Id. ¶ 15); and (D) he did not knowingly and voluntarily waive his Miranda warnings. The government submits that each of these arguments lacks merit, and respectfully asserts that the defendant's motion should be denied in its entirety.

### A.     There Was Probable Cause to Arrest the Defendant at the Exxon Station

Probable cause is a relatively low burden of proof in the criminal justice system. Determinations of probable cause are often made by law enforcement officers "on the scene and under pressure." United States v. Brown, 33 Fed. Appx. 606, 608 (3d Cir. Feb. 28, 2002).

---

[12] The Form 88 in question mistakenly lists a date of "1-03-07." GX 4. The correct date of the search was January 3, 2008 – the same date as the defendant's arrest. D.I. 23 at 42.

Accordingly, such determinations do "'not require the fine resolution of conflicting evidence that a reasonable doubt or even preponderance standard demands.'"). Id. (quoting Paff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 2000)).  Rather, "[i]t is well established that probable cause for a warrantless arrest exists when, at the time of the arrest, the facts and circumstances within the officer's knowledge are 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" United States v. Glasser, 750 F.2d 1197, 1205 (3d Cir. 1984) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).  Indeed, the Third Circuit has "previously found probable cause even in the absence of the actual observance of criminal conduct when a prudent observant would reasonably infer that a defendant acted illegally." United States v. Burton, 288 F.3d 91, 98 (3d Cir. 2002) (citing Illinois v. Gates, 462 U.S. 213, 243 (1983) ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.")).

In reviewing a probable cause determination, a court should use a common sense approach and examine the totality of the circumstances leading up to the arrest. Glasser, 750 F.2d at 1205-06. Moreover, it is appropriate for the Court to look at the facts presented "through the lens of [a] reasonable officer's experience and training," since "police officers may draw inferences and make deductions that would elude an untrained person." United States v. Persaud, 167 Fed. Appx. 920, 921-22 (3d Cir. Feb. 16, 2006) (citing cases); United States v. Yusuf, 461 F.3d 374, 390 (3d Cir. 2006) (indicating that the probable cause determination should "consider the cumulative weight of the information set forth by the investigating officer in connection with reasonable inferences that the officer is permitted to make based upon the officer's specialized training and experiences.").

On the morning of January 3, 2008, Agent Hughes had probable cause to arrest the defendant.

Considering the totality of the circumstances – including the information provided to him by a past-proven reliable confidential informant, his own observations of the defendant's conduct, as well as his training and experience – Agent Hughes had a reasonable basis to believe that the defendant was attempting to take possession of ten ounces of cocaine at the time of his arrest. In particular, at that time, Agent Hughes was aware of the following:

1. **The CS had given reliable information to Agent Hughes in the past and had a history of engaging in cocaine trafficking activity with the defendant.** A confidential source's reliability and basis of knowledge are important considerations when the information he provides is used in a probable cause determination. See Gates, 462 U.S. at 238 (placing weight on an informant's "veracity" and "basis of knowledge" in determining whether information provided may rise to the level of probable cause). Agent Hughes believed the CS to be reliable and trustworthy, due to the fact that he had provided him with information in the recent past that lead to arrests and seizures. Id. at 7, 47. Further, the CS indicated that he had personal knowledge of the defendant's prior drug trafficking activity, including recent discussions with regard to transporting kilograms of cocaine from California into Delaware (D.I. 23 at 7-8), as well as a history of selling the defendant cocaine (including in the context of exchanging cocaine for attorney funds). Id. at 7, 56.

2. **The CS and the defendant engaged in four phone calls that were consistent with the arrangement of a drug deal.** Agent Hughes monitored and/or reviewed four recorded calls between the CS and the defendant that took place prior to Cook's arrest. Id. at 13-14; id. at 26. In Hughes' opinion, according to this training and experience, the phone calls were consistent with setting up a drug transaction. D.I. 23 at 17, 45, 49, 51.

   On December 27, 2007, the CS telephoned the defendant and discussed the sale of "that thing" so that the CS could raise money for an attorney. GX 2 at Track 1; GX 1 at Track 1. That "thing," in this context, referred to ten ounces of cocaine.[13] D.I. 23 at 17. In the four recorded calls between the CS and the defendant, the defendant repeatedly indicated a willingness to do the transaction with the CS. In the first call,

---

[13] Although the defendant may argue that the word "cocaine" is not specifically used in the recorded calls, it is not a typical practice for traffickers to use such terminology. D.I. 23 at 56-57 (Hughes indicating that in his 15 years of law enforcement experience he has never heard anyone ask to buy "cocaine" from someone). Indeed, it comports with common sense that a drug trafficker would attempt to minimize his exposure to detection by not using such terminology over a phone line that might be intercepted.

> on December 27, 2007, in response to the CS's offer to sell "that thing", the defendant quickly stated, "let's go," "let's go." GX 2, Track 1 at 00:16-00:35; GX 1 at Track 1. Further at approximately 7:05 p.m. on January 2, 2008, when the CS indicated that he had to wait to get "it" – the ten ounces of cocaine – from his brother, the defendant expressed disappointment: "Ahhh man…all right, can, can't catch anything tonight?" GX 2, Track 5 at 00:09-00:23; GX 1 at Track 5; D.I. at 24-25 (indicating that "it" referred to the ten ounces of cocaine). Lastly, after the CS told the defendant that he would be ready to go in the morning (GX 2, Track 5 at 00:09-00:23; GX 1 at Track 5; D.I. 23 at 24-25), the defendant told the CS to go to "run across the street" and see him at the "spot." GX 2, Track 7 at 00:34-00:40; GX 1 at Track 7.

> 3. **Agent Hughes observed activity consistent with the CS delivering the "sham" substance to the defendant.** The defendant arrived at the Exxon station ten minutes after the final call with the CS; he was in a vehicle that the CS predicted he would be driving. Id. at 29-30. The defendant then dropped off two passengers at the mini-mart; he did not go inside himself, but pulled up to a location out of the way of the front door. D.I. 23 at 29-31. The CS walked across the street to the Exxon station with only the bag of "sham" in his hands. Id. at 32-24. He then climbed into the defendant's truck where the two sat for 30 seconds to a minute. Id. at 32-34. The defendant turned toward the defendant and the CS made hand movements consistent with the CS handing something over to the defendant. Id. at 33. The CS then took off his hat – a prearranged signal that he had delivered the sham to the defendant. Id. at 33-34.

These circumstances, considered in their totality, provided Agent Hughes with a reasonable belief that the defendant was attempting to commit a drug transaction.[14] Accordingly, there was probable

---

[14] At the evidentiary hearing, counsel for the defendant asked Agent Hughes if he recalled telling the defendant the following during his post-arrest interview: "Quote, I'm not saying you would have done the deal there, nevertheless, you would have done it, end quote" D.I. 23 at 54. The government is unclear as to what relevance a post-arrest statement has to the defendant's motion, as probable cause is determined "at the time of the arrest." Glasser, 750 F.2d at 1205-06.

Nevertheless, contrary to the defense's representation at the evidentiary hearing, the statement in question was actually, "I'm not saying **you said** you would have done the deal there, but you know, nevertheless, you would have done it." Government's Exhibit 6, Track 1 at 15:36 to 15:41 (emphasis added). This a correct factual summary of what Agent Hughes observed. In the recorded calls, the defendant did not explicitly state over the phone "let's do the deal" at the "spot." However, given the circumstances, it was reasonable for Agent Hughes to conclude, in light of his training and experience, that the defendant had the intention of taking possession of ten (10) ounces of cocaine at the time of his arrest.

cause for the defendant's arrest. Indeed, courts have found probable cause to arrest under arguably less convincing factual scenarios. See Burton, 288 F.3d at 97-99 (affirming a finding of probable cause to arrest the defendant who was seen carrying a bag from a house where a drug deal was believed to be taking place); Persaud, 167 Fed. Appx. at 922 (affirming a finding probable cause to arrest individual who was involved in suspicious activity that, according to an officer's training and experience, resembled two drug transactions although the defendant was not seen with controlled substances prior to arrest); United States v. Hill, No. Crim. A. 04-41-JJF, 2005 WL 1745662 at *4 (D. Del. July 19, 2005) (Farnan, J.) (concluding that there was probable cause to arrest a defendant, a reported drug dealer, when he arrived at a specified meet location shortly after being summoned to do so in a coded phone call with a confidential informant). Accordingly, this aspect of the defendant's motion should be denied.

**B.    The Defendant's Person and Vehicle Were Properly Searched Incident to Arrest**

After the defendant was removed from his truck and arrested, Agent Hughes searched his person and vehicle; on the defendant's person, Agent Hughes recovered $4643.00 as well as a vial of prescription pills. D.I. 23 at 35. Although the defendant challenges the constitutionality of these searches, it is established law that, after performing a valid arrest of an occupant of a motor vehicle, a law enforcement officer may search both the individual's person and the vehicle's passenger compartment incident to that arrest. See Illinois v. Lafayette, 462 U.S. 640, 644 (1983) (permitting the search of an individual's person pursuant to a valid arrest) (citing United States v. Robinson, 414 U.S. 218 (1973)); Gov't of Virgin Islands v. Rasool, 657 F.2d 582, 585, 588-89 (3d Cir. 1981) (upholding search of bag in passenger compartment of vehicle incident to arrest even though defendant was handcuffed). Therefore, the government respectfully submits that this argument lacks

merit.

### C. The Defendant Gave the DEA Consent to Search His Residence

The defendant next asserts that the search of his residence was in violation of the Fourth Amendment. D.I. 18 ¶ 15. As Agent Hughes' testified, however, Cook gave DEA agents written consent to search his residence, located at 2325 Diamond Street in Wilmington. D.I. 23 at 40-42; GX 4. Indeed, the defendant accompanied the DEA agents to his home and, without handcuffs on, led the agents/officers around and specifically indicated where various contraband was located. Id. at 43. In these circumstances, where valid consent is given, probable cause is unnecessary to search an individual's residence. United States v. Lockett, 406 F.3d 207, 211 (3d Cir. 2005) (indicating that consent is a valid exception to the warrant and probable cause requirements of the Fourth Amendment). Therefore, this aspect of defendant's motion should be denied.

### D. The Defendant Voluntarily Waived His Miranda Rights

The last argument the defendant makes is one under Miranda v. Arizona, 384 U.S. 436 (1966). D.I. 18 ¶¶ 16-18. In particular, the defendant asserts that he was "not advised of his rights pursuant to Miranda, and there was no affirmative indication of understanding or voluntary waiver of the entire litany of constitutional rights." Id. ¶ 18. This is incorrect.

The evidence presented at the suppression hearing demonstrates that the defendant was given his Miranda rights and he voluntarily waived them. See Moran v. Burbine, 475 U.S. 412, 421 (1986) (indicating that a waiver of Miranda rights must be the product of "a free and deliberate choice rather than intimidation, coercion or deception," and made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it"). In particular, Agent Hughes testified – without contradiction – that he went over each and every one of the defendant's

Miranda rights with him prior to the interview using a DEA Form 13. D.I. 23 at 37-38; GX 3. Thereafter, the defendant initialed every right listed on the form, and signed at the bottom indicating that (1) he understood what his rights were, and (2) he was willing to "freely and voluntarily answer questions without a lawyer present." GX 3; D.I. 23 at 37-38. Moreover, at the time he signed the DEA Form 13, the defendant was not handcuffed, he was in an interview room with the door open, he did not appear to be under the influence of any drugs, and he was not threatened in any way. D.I. 23 at 37-40. With these circumstances in mind, the government respectfully asserts that the defendant's Miranda argument lacks merit.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the government respectfully requests that the Court deny defendant's Motion to Suppress Evidence (D.I. 18).

        Respectfully submitted,

        COLM F. CONNOLLY
        United States Attorney

BY:   /s/ Shawn A. Weede
       Shawn A. Weede
       Assistant United States Attorney

Dated: June 19, 2008

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )  Criminal Action No. 08-41-JJF |
| | ) |
| JAMES COOK, | ) |
| | ) |
| Defendant. | ) |

## **ORDER**

     AND NOW, this _____ day of _____, 2008, upon consideration of the defendant's Motion to Suppress Evidence (D.I. 18), and the government's response thereto, it is hereby ORDERED that defendant's motion is DENIED.

                            By the Court:

                            _____
                            Honorable Joseph J. Farnan, Jr.
                            United States District Court Judge

Dated: