IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Criminal Action No. 08-041-GMS |
| JAMES COOK, | ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM**

**I.   INTRODUCTION**

On March 4, 2008, the Grand Jury for the District of Delaware indicted the defendant, James Cook ("Cook") on: (1) one count of knowing possession of a controlled substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and (2) one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). (D.I. 3.) Presently before the court is Cook's motion to suppress evidence seized from him on or about January 3, 2008, including any and all statements made to law enforcement officers. (D.I. 18.) The court held an evidentiary hearing in connection with this motion on June 4, 2008.[1] (D.I. 23.) The parties subsequently submitted briefing, including proposed findings of fact and conclusions of law. (D.I. 24, 26.) After having considered the transcripts from the June 4, 2008 evidentiary hearing, the parties' submissions, and the applicable law, the court will deny Cook's

---

[1] The June 4, 2008 evidentiary hearing was held before Judge Joseph J. Farnan, Jr. (D.I. 23.) The transcript from that hearing was filed on June 9, 2008. (*Id.*) Citing his familiarity with the defendant's family, on July 28, 2008, Judge Farnan entered an order recusing himself from this case. (D.I. 27.) The case was then reassigned to Chief Judge Gregory M. Sleet on July 30, 2008.

motion.

## II. FINDINGS OF FACT

At the evidentiary hearing, the government called one witness: David Hughes ("Hughes"), a special agent with the Drug Enforcement Administration (the "DEA"). (D.I. 23 at 4.) Cook did not call any witnesses. The following represents the court's essential findings of fact as required by Rule 12(d) of the Federal Rules of Criminal Procedure.[2]

In December 2007, a confidential informant ("CI") informed Hughes that the CI,[3] Cook, and another individual recently discussed transporting kilograms of cocaine from California into Delaware. (D.I. 23 at 7-8.) The CI indicated that he and Cook: (1) had "a long history" together, (2) were previously involved in the distribution of cocaine, and (3) that the CI sold cocaine to Cook on "several occasions" in the past. (*Id.* at 7.) After receiving this information, Hughes decided to investigate Cook and to conduct a "reverse operation."[4] (*Id.* at 7-8.) As part of this operation, the CI agreed to pose as a drug dealer. (*Id.* at 9-10.) "The plan was to have [Cook] show up with money to purchase ten ounces of cocaine." (D.I. 23 at 10.)

---

[2] In making these factual findings, the court relies upon the transcripts from the June 4, 2008 evidentiary hearing. The court recognizes that, in some cases, where credibility is at issue, it may be necessary for the court to hear a witness' testimony first hand and to observe the witness' demeanor on the stand, in order to assess that witness' credibility. In this case, however, since credibility is not at issue, hearing Hughes' testimony and observing his demeanor on the stand is not necessary.

[3] Hughes testified that he regarded the CI as "reliable", since the CI provided law enforcement with "reliable information" in the past that led to arrests and seizures. (D.I. 23 at 7.)

[4] A "reverse operation" is an investigation technique whereby a DEA agent, or someone acting on the DEA's behalf, poses as a drug dealer and "delivers drugs on the streets" in order to arrest someone who is looking to purchase a controlled substance. (D.I. 23 at 9.) Specifically, "[d]uring the exchange, the suspect will bring in the money and [the DEA agent will] bring in the drugs, and [the suspect is] arrested." (*Id.*)

During the course of the operation, Hughes directed the CI to perform a series of four recorded and monitored telephone calls with Cook.[5] (D.I. 23 at 10.) The first recorded telephone call between the CI and Cook occurred on December 27, 2007, at approximately 1:00 p.m. (*Id.* at 14-15.) In that first call, the CI and Cook discussed the following:

CI: I gotta at least have at least *10 stacks* down for my lawyer.

Cook: Right.

CI: And, uh, do you remember *that thing* we talked about the other night?

Cook: Yes.

CI: I need to get rid of that bad man, I gotta bring [UNINTELLIGIBLE] . . .

Cook: Let's go.

CI: . . . [UNINTELLIGIBLE] . . . kind of money.

Cook: Let's go.

(D.I. 26 at 4, emphasis added.) The CI informed Hughes that the phrase "ten stacks" refers to ten thousand dollars, and the phrase "that thing" refers to ten ounces of cocaine. (D.I. 23 at 17.)

The second recorded telephone call between the CI and Cook occurred on January 2, 2008, at 3:05 p.m. (D.I. 23 at 21-22.) During that call, the CI stated that he "needed some money" for an attorney, and asked whether Cook was still going to do "that thing" with him. (*Id.* at 17, 22.) Also, in that call, Cook asked the CI to "come see" him in person. (*Id.* at 22-23.)

The third recorded telephone call between the CI and Cook occurred on January 2, 2008, at 7:05 p.m. (D.I. 23 at 23.) During that call, the CI advised Cook that he could not get "it" until that

---

[5] During these calls, Hughes would either (1) have the CI perform a "three way" call, so that Hughes could monitor and record the conversation, or (2) be physically present with the CI when the CI made the call. (D.I. 23 at 13-14.)

following morning. (*Id.* at 24-25.) In addition, the CI and Cook discussed the following:

> CI: Hey look, uh, I'm gonna hook up with my brother first thing in the morning, right?
>
> Cook: Ahhh man . . . all right, can, can't catch anything tonight?
>
> CI: Nah, I can't get nothing, 'cause he's uh, he's working and he has to go back to the Plummer Center, but he's gonna come by here first thing in the morning . . .
>
> Cook: Okay.

(D.I. 26 at 6.) In addition, the CI and Cook agreed to talk again on that following day. (D.I. 23 at 25.)

The fourth recorded telephone call between the CI and Cook occurred on January 3, 2008, at 10:37 a.m. (D.I. 23 at 26.) In that call, Cook informed the CI that he was going to pick up a cup of coffee at "the spot", and instructed the CI to "run across the street and come see [him]"[6] in person. (*Id.* at 27; *see also* D.I. 26 at 7.)

Following the fourth recorded call, and in preparation for the CI's in person meeting with Cook, law enforcement officers provided the CI with a plastic bag containing ziplock bags of "sham"[7] for delivery to Cook. (D.I. 23 at 27-28.) Hughes and several other law enforcement agents then proceeded to set up surveillance at the Exxon gas station to monitor the transaction between the CI and Cook, and to prepare to "take down [Cook] at that location." (*Id.* at 27.) Approximately eight minutes later, Hughes observed Cook enter the Exxon parking lot in a silver, gray, Dodge Ram,

---

[6] The CI informed Hughes that "the spot" refers to an Exxon gas station and mini-mart located "around Route 4 and Route 7" (the "Exxon"). (D.I. 23 at 27.)

[7] "Sham" is a substance made to look like ten ounces of cocaine. It is used in reverse operations rather than real cocaine so that, if something goes wrong, the DEA has not caused real drugs to get on the street. (D.I. 23 at 28.)

pickup truck. (*Id.* at 30.) After arriving at the location, Cook initially pulled around to the front of the mini-mart area of the Exxon and let two white males out of the truck. (*Id.* at 31.) Cook subsequently pulled the truck to a location just beyond the mini-mart entrance. (D.I. 23 at 31.)

Moments later, Hughes observed the CI cross the street and enter Cook's truck, carrying only the plastic bag with the sham. (D.I. 23 at 32-34.) After the CI entered the truck,[8] Hughes then observed Cook turn to face the CI, and the CI, in turn, make a hand movement towards Cook. (*Id.* at 33.) Hughes then observed the CI remove his baseball cap to signal to Hughes that Cook accepted delivery of the sham. (*Id.* at 34.) After receiving the signal, Hughes and the other law enforcement officers "moved in" to arrest Cook. (*Id.* at 34.) In effecting Cook's arrest, the officers removed Cook from his vehicle, placed him on the ground, and handcuffed him. (D.I. 23 at 35.) Cook was then searched incident to arrest, and found to have $4643.00 on his person, as well as a vial of prescription pills. (*Id.*) Immediately after arresting Cook, Hughes read Cook his *Miranda* rights from Hughes' DEA 13A card. (*Id.* at 35-36.)

Following the arrest, Cook was transported back to the DEA office for an interview. (D.I. 23 at 37.) Once at the DEA office, Cook was placed in an interview room and interviewed. (*Id.* at 37.) During Cook's interview, the door of the interview room was left open and he was not placed in handcuffs. (*Id.* at 37.) Also during the interview, Hughes re-read Cook his *Miranda* rights from his DEA Form 13 card. (*Id.* at 38.) Cook then signed the DEA Form 13 -- waiving those rights. (D.I. 23 at 38.) After waiving his *Miranda* rights, Cook then proceeded to give a 45-minute statement discussing a number of topics, including his involvement with cocaine trafficking and purchasing. (*Id.* at 40.)

---

[8] The CI was in Cook's truck for approximately 30 to 60 seconds. (D.I. 23 at 33.)

In his statement, Cook further indicated that he had certain contraband at his home, including a firearm and certain prescription tablets. (D.I. 23 at 40-42.) After receiving this information, Hughes asked Cook for consent to search Cook's home. (*Id.*) Specifically, Hughes reviewed DEA Form 88 with Cook and requested Cook's consent to search the residence located at 2325 Diamond Street in Wilmington, Delaware. (*Id.* at 42.) After reviewing the form, Cook signed it-- consenting to the search of his residence. (*Id.*) Accompanied by Hughes and two other officers, Cook was then transported to his residence. (D.I. 23 at 42-43.) After arriving at the residence, Cook's handcuffs were removed. (*Id.* at 43.) Cook then proceeded to lead Hughes and the two other law enforcement officers throughout the house -- pointing out where various contraband was located. (*Id.*) Pursuant to the search, while at the residence, law enforcement officers located 11 firearms, various types of prescription pills, a knife, and a digital scale. (*Id.* at 43-44.) The knife and digital scale were covered in what appeared to be cocaine residue. (D.I. 23 at 43-44.)

## III. CONCLUSIONS OF LAW

Cook seeks to suppress any and all evidence seized by law enforcement officers, as well as any statements made during and after his arrest. (D.I. 18.) He makes four arguments in support of his motion: (A) first, he contends that his arrest was not supported by probable cause (*Id.* at ¶ 13); (B) second, he contends that the search of his person and his vehicle after his arrest was not supported by probable cause (*Id.* at ¶ 14-15); (C) third, he contends that the search of his home was unconstitutional. (*Id.* at ¶ 15); and (D) fourth, he contends that he did not knowingly and voluntary waive his *Miranda* warnings (D.I. 18 at ¶¶ 16-18). The government, on the other hand, contends that each of Cook's arguments lack merit, and that his motion should, therefore, be denied in its entirety. (D.I. 26 at 9.)

### A.     Whether there was Probable Cause to Arrest Cook at the Exxon

Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient to lead a reasonable person to believe that an offense has been committed. *See United States v. McGlory*, 968 F.2d 309, 342 (3d Cir. 1992); *see also Beck v. Ohio*, 379 U.S. 89, 91 (1964). Whether the police have probable cause for a warrantless arrest is determined by the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 230-32 (1983). The Supreme Court has stated that probable cause to justify an arrest means "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) (citations omitted). Furthermore, "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime. . . . [The Supreme Court has] made clear that the kinds and degree of proof and the procedural requirements necessary for a conviction are not prerequisites to a valid arrest." *Id.* (citations omitted).

Here, the court concludes that there was probable cause to arrest Cook at the Exxon. As the government correctly notes, considering the totality of the circumstances, Hughes had a reasonable basis to believe that Cook was attempting to take possession of ten ounces of cocaine at the time of his arrest. Indeed, at the time of Cook's arrest, Hughes' decision was informed by the following "facts and circumstances": (1) the CI had provided Hughes with reliable information in the past; (2) the CI had a history of engaging in drug trafficking activity with Cook; (3) the CI reported having recent discussions with Cook regarding transporting kilograms of cocaine from California to Delaware; (4) the CI and Cook engaged in a series of four recorded phone calls that, according to

Hughes' training and experience, were consistent with the arrangement of a drug deal; and (5) immediately prior to the arrest, while at the Exxon, Hughes observed activity consistent with the CI delivering the "sham" substance to Cook.

Moreover, as to the activity at the Exxon, Hughes specifically observed the CI enter Cook's truck with a bag of sham in his hands, Cook turn towards the CI, the CI make hand movements consistent with handing the bag of sham over to Cook, and the CI signaling that he had delivered the sham to Cook. The court is persuaded that these circumstances, when considered in their totality, provided Hughes with a reasonable belief that Cook was attempting to commit a drug transaction. The court must, therefore, deny Cook's motion in this regard.

### B. Whether Cook's Person and Vehicle were Properly Searched Incident to Arrest

Likewise, the court finds that both Cook's person and his vehicle were properly searched incident to arrest. Indeed, the law in this area is clear: after performing a valid arrest of an occupant of a motor vehicle, a law enforcement officer may search both the individual's person and the vehicle's passenger compartment incident to arrest. *See Illinois v. Lafayette*, 462 U.S. 640, 644 (1983) (permitting the search of an individual's person incident to a valid arrest); *United States v. Robinson*, 414 U.S. 218 (1973) (search incident to lawful arrest permitted) (citation omitted); *Gov't of Virgin Islands v. Rasool*, 657 F.2d 582, 585, 588-89 (3d Cir. 1981) (upholding search of passenger compartment of vehicle incident to arrest). Here, in effecting Cook's arrest, the officers removed him from his vehicle, placed him on the ground, and handcuffed him. They then properly searched his person and his vehicle incident to his arrest. The court must, therefore, deny Cook's motion in this regard as well.

### C. Whether Cook Consented to the Search of his Residence

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. A court determines a search's reasonableness "by assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which [the search] is needed for the promotion of legitimate government interests." *United States v. Knights*, 534 U.S. 112, 118-119 (2001). While this balancing "generally requires that a warrant be obtained upon a showing of probable cause before a residence may be searched," factors such as consent may alter that balance. *United States v. Williams*, 417 F.3d 373, 376 (3d Cir. 2005); *cf. Scneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

Likewise, the warrantless entry of a person's home, whether to make an arrest or to conduct a search for specific objects, is generally prohibited by the Fourth Amendment. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). This prohibition, however, does not apply when "voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Id.* (internal citations omitted).

Here, Cook contends that the search of his home was unconstitutional. The court disagrees. The court is satisfied that Cook gave DEA agents written consent to search his residence. Indeed, as the government correctly points out, Cook accompanied the DEA agents to his home and, without handcuffs on, led agents around, and specifically indicated where specific contraband was located. The court is simply not persuaded that Cook's cooperation in this regard, including signing the DEA Form 88, was anything other than consensual. Accordingly, the court must deny this aspect of Cook's motion.

### D. Whether Cook Voluntarily Waived his *Miranda* Rights

The Fifth Amendment prohibits the Government's use in its case-in-chief of a defendant's statements made as a result of custodial interrogation by law enforcement officers unless the defendant is first advised of, and waives, his Miranda rights. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The Supreme Court has defined interrogation as "express questioning or its functional equivalent" beyond merely the custody itself. *Rhode Island v. Innis*, 446 U.S. 291, 299-302 (1980). The Fifth Amendment does not, however, bar an in-custody defendant's statements that are volunteered. *See Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986). The government bears the burden of proving that the defendant waived his *Miranda* rights, or that the defendant gave a statement voluntarily, by a preponderance of the evidence. *Id.* at 169-170.

Here, Cook contends that he did not knowingly and voluntary waive his *Miranda* rights in this case. The court finds otherwise. That is, the court is persuaded that Cook was given and fully advised of his *Miranda* rights, and that he knowingly and voluntarily waived them. At the evidentiary hearing, Hughes testified -- without contradiction -- that: (1) immediately after arresting Cook, he read Cook his *Miranda* rights from his DEA 13A card, (2) during Cook's interview at the DEA's offices, he re-read Cook his *Miranda* rights from his DEA Form 13 card, and (3) Cook signed the DEA Form 13 -- initialing every right listed on the form. Furthermore, as the government correctly notes, Cook signed at the bottom of the form, indicating that (1) he understood what his rights were and (2) he was willing to "freely and voluntarily answer questions without a lawyer present." (D.I. 23 at 37-38.) In addition, at the time he signed the waiver form, Cook was not handcuffed, he was in an interview room with the door open, and there is no claim that he was under the influence of any drugs or otherwise threatened in any way. Considering these circumstances, the court finds that the

government has met its burden of showing that Cook both knowingly waived his *Miranda* rights and gave the statement at issue voluntarily. Cook's motion in this regard is, therefore, denied.

## IV. CONCLUSION

For the foregoing reasons, the court hereby denies the defendant's motion to suppress evidence.

Dated: February 24, 2009

CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 08-041-GMS |
| | ) | |
| JAMES COOK, | ) | |
| | ) | |
| Defendant. | ) | |

## **ORDER**

For the reasons stated in the court's Opinion of this same date, IT IS HEREBY ORDERED THAT:

1. The defendant's motion to suppress evidence (D.I. 18) is DENIED.

Dated: February 24, 2009

_____
CHIEF, UNITED STATES DISTRICT JUDGE